UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Craig M.,                                          Case No. 18-cv-908 (NEB/DTS)

      Plaintiff,

v.                                                 **REPORT AND RECOMMENDATION**

NANCY A. BERRYHILL,
*Acting Commissioner of Social Security,*

      Defendant.

_____

Stephanie M. Balmer, Falsani, Balmer, Peterson & Balmer, 1200 Alworth Bldg., 306 W. Superior St., Duluth, MN 55802, for Plaintiff

Linda Green, Social Security Administration, 1301 Young St., Suite A702, Dallas, TX 75202, for Defendant
_____

      Craig M. appeals the Commissioner of Social Security's denial of his Title II application for a period of disability and disability insurance benefits alleging a disability onset date of October 15, 2015, the date he last worked. He contends that the Appeals Council erred in declining to review newly submitted medical records, that the ALJ's RFC finding and the factual determinations on which it is based are not supported by substantial evidence in the record, and that the ALJ did not give appropriate weight to his treating physician's opinion. For the reasons stated below, the Court recommends that the Commissioner's decision be affirmed.

I.    **ALJ DECISION**

      The Commissioner uses a five-step sequential evaluation process to determine whether a claimant is entitled to disability benefits. 20 C.F.R. § 404.1520(a). The

Commissioner evaluates "(1) whether the claimant is currently employed; (2) whether the claimant is severely impaired; (3) whether the impairment is, or approximates, a listed impairment; (4) whether the claimant can perform past relevant work; and if not, (5) whether the claimant can perform any other kind of work." *Brock v. Astrue*, 674 F.3d 1062, 1064 n.1 (8th Cir. 2012); *see also* 20 C.F.R. § 404.1520(a)(4).

The ALJ issued her decision on September 13, 2017. In steps one through three, she found that Craig M. has not engaged in substantial gainful activity since October 15, 2015; has several severe medically determinable impairments – coronary artery disease; chronic obstructive pulmonary disease; right diaphragm paralysis; asthma; diabetes with neuropathy; left shoulder rotator cuff impingement/tendinopathy; obesity; degenerative disc disease of the cervical spine[1]; and obstructive sleep apnea – that do not meet or medically equal any listed impairment contained in 20 C.F.R., Part 404, Subpart P, Appendix 1; and has the residual functional capacity (RFC) to perform light work with certain limitations: no climbing of ladders, ropes, or scaffolds; occasional climbing of ramps or stairs; occasional stooping, kneeling, or crouching; no crawling; no tasks that would specifically require the act of balancing, such as walking along a narrow plank; no work at unprotected heights; in essentially an indoor, temperature-controlled type environment, such that there would not be exposure to extreme heat, extreme cold, humidity, wetness, fumes, dust, odors, gases, poor ventilations, and those types of irritants; and allowing for the opportunity to sit or stand while remaining in the work space performing the task at hand. R. 387, 390.

---

[1] Claimant alleges that the ALJ failed to find his degenerative disc disease of the cervical spine was a severe impairment [Pl. Br. 8-10, Docket No. 14], but this is flatly contradicted by the record. R. 387. ("R." refers to the Administrative Record, Docket No. 10.)

At step four the ALJ found Craig M. was incapable of performing his past relevant work (PRW) as a heavy equipment operator. R. 399. At step five she found he was capable of performing other work within the RFC such as small parts assembler, sub-assembler, and electrical accessories assembler and therefore he was not disabled  R. 400-01.

## II.    STANDARD OF REVIEW

The Commissioner's denial of disability benefits is subject to judicial review. 42 U.S.C. §§ 405(g), 1383(c)(3). This Court has authority to "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying or reversing a decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." *Id.* § 405(g) (sentence four).

Disability under the Social Security Act means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* § 423(d)(1)(A). Under the regulations, disability means that the impairment(s) is/are so severe that the claimant is not only unable to engage in previous work, but cannot engage in any other kind of substantial gainful employment that exists in the national economy. *Id.* § 423(d)(2)(A).

This Court "must affirm the Commissioner's decision if it is supported by substantial evidence on the record as a whole." *Telkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006). Substantial evidence is "less than a preponderance, but enough that a reasonable mind might accept as adequate to support a conclusion." *Lewis v. Barnhart*,

353 F.3d 642, 645 (8th Cir. 2003). On review, the Court considers "both evidence that detracts from and evidence that supports the Commissioner's decision." *Hartfield v. Barnhart*, 384 F.3d 986, 988 (8th Cir. 2004). If it is possible, based on the evidence in the record, to reach two inconsistent decisions, and one of those decisions is the Commissioner's position, the decision must be affirmed. *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003). In other words, the denial of benefits will not be disturbed "so long as the ALJ's decision falls within the available zone of choice. An ALJ's decision is not outside the zone of choice simply because [the reviewing court] might have reached a different conclusion had [it] been the initial trier of fact." *Bradley v. Astrue*, 528 F.3d 1113, 1115 (8th Cir. 2008); *see also Bland v. Bowen*, 861 F.2d 533, 535 (8th Cir. 1988) ("The concept of substantial evidence . . . embodies a zone of choice within which the Secretary may grant or deny benefits without being subject to reversal on appeal.").

The claimant bears the burden of proving entitlement to disability benefits. *See* 20 C.F.R. § 404.1512(a); *Young v. Apfel*, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000). Once the claimant demonstrates that he or she cannot perform past work, the burden "shifts to the Commissioner to prove, first that the claimant retains the residual functional capacity to do other kinds of work, and, second that other work exists in substantial numbers in the national economy that the claimant is able to do." *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000).

## III.    ANALYSIS

### A.    Newly Submitted Medical Records

Craig M. contends that the Appeals Council erred in declining to review the ALJ's decision based on the additional records he submitted. Pl. Br. 5-7, Docket No. 14.

The Appeals Council will review an ALJ's decision when it "receives additional evidence that is new, material, and relates to the period on or before the date of the hearing decision, and there is a reasonable probability that the additional evidence would change the outcome of the decision." 20 C.F.R. § 404.970(a)(5) (eff. Jan. 17, 2017). The applicant must also show "good cause" for not timely submitting the evidence due to certain specified reasons. *Id.* § 404.970(b). However, the Appeals Council did not reach the issue of good cause when it stated its reasons for denying Craig M.'s request for review.[2]

When the Appeals Council denies review of an ALJ's decision after reviewing newly submitted evidence, a reviewing court does not evaluate the council's decision to deny review but rather examines the record as a whole, including the additional evidence, to determine whether it supports the ALJ's decision. *See McDade v. Astrue*, 720 F.3d 994, 1000 (8th Cir. 2013). When the Appeals Council denies review without substantively considering newly submitted evidence, the reviewing court may remand the case if it finds the evidence is new, material, and relates to the period of disability at issue. See *Nelson v. Sullivan*, 966 F.2d 363, 366 (8th Cir. 1992); 20 C.F.R. § 404.970(a)(5) and (c).

The relevant period for Craig M.'s disability benefits application is from October 15, 2015, his last day of work as a heavy equipment operator, and September 13, 2017,

---

[2] Craig M. did not offer any "good cause" to the Appeals Council in his December 10, 2017 request for review. R. 838-39. The Appeals Council mentioned the good cause requirement but made no finding regarding good cause when it declined to review the ALJ's decision. R. 1-4. The Commissioner's brief to this Court points out that Craig M. never offered any good cause at the administrative appeal stage [Def. Br. 6 n.3, Docket No. 16], but the Commissioner does not rely on this in opposing Craig M.'s appeal.

the date of the ALJ's decision denying benefits. The Appeals Council reviewed the records that pre-date the ALJ's decision (November 8, 2011 to July 11, 2017 [R. 430-586]) and found they do not show a reasonable probability of changing the outcome of the ALJ's decision. The council therefore denied his request for review of the ALJ's decision. Jan. 26, 2018 Notice of Appeals Council Action, R. 1-4.

With respect to the records that post-date the ALJ's decision (October 2, 2017 through November 21, 2017 [R. 16-64, 66-381]), the Appeals Council concluded they do "not relate to the period at issue" and therefore did "not affect the decision about whether you were disabled beginning on or before September 13, 2017." R. 2. The council advised him of his right to file a new application to consider whether he was disabled after September 13, 2017. R. 2.

The Court has examined the records that pre-date the ALJ's September 13, 2017 decision. For the reasons stated in the individual sections below, the Court finds they are not material to the ALJ's RFC determination and her conclusion that Craig M. was not disabled on or before September 13, 2017.

The Court also reviewed the treatment records that post-date the ALJ's decision and finds they do not relate to the period of disability at issue here. Craig M. asserts they should have been considered because they "involved the same medical conditions as were at issue at hearing and provided further relevant evidence regarding the nature and severity of those conditions and their resulting functional impacts." Pl. Br. 7, Docket No. 14. However, this assertion does not accurately characterize the records from October and November 2017, and Craig M. has not identified or offered any explanation

of how any of those records sheds light on his functional work-related limitations that existed on or before September 13, 2017.

The October and November 2017 records document Craig M.'s hospitalization for neck surgery (cervical laminectomy) with abscess drainage, a serious neck infection, in-patient post-surgery physical therapy, and post-surgery follow-up after his discharge from the hospital. His hospitalization came about after he went to see his treating physician, Dr. James Montana, on October 2, 2017 when he experienced an episode of severe neck pain immediately after he lifted a heavy wet 18-inch maple log on approximately September 30, 2017. R. 67, 200, 317-18, 344-45, 359.

Dr. Montana's record states, "Patient presents with Neck Pain – hurt on Saturday lifting a piece of wood – severe neck pain that is limiting rotational, flex and extension to a much greater than usual extent. It occurred suddenly when he was lifting 18 inch wet maple log for splitting. He denies radiculopathy down arms or change in LE function." R. 344-45. Other hospital records also document his report that this pain was unlike his previous or usual neck pain: "He stated that the neck pain is significantly worse than his usual pain from degenerative disc disease." R. 359; "[N]eck pain occurred on approximately September 30, when he was lifting a heavy log. The pain was in his parotid region down to his neck and became progressively severe. This was unlike his usual neck pain that he had from degenerative disease." R. 67; "On 9/30 he was lifting a wet heavy maple log and had immediate onset of severe left upper neck pain. Patient does have history of chronic neck pain due to degenerative disc disease but never had this much pain. Denies tingling, numbness or weakness." R. 200. A post-operative

medical record says he reported that, pre-hospitalization, he "was independent with activities of daily living, mobility, home management. Cuts/hauls wood." R. 68.

Craig M. points to two records: an October 23, 2017 post-surgery in-patient physical therapy record at R. 98 that assessed motor coordination deficits in both hands, and a post-discharge Infectious Disease follow-up appointment on November 21, 2017 at R. 27 and 31 in which he reported numbness/tingling in his fingers that he attributed to his diabetic neuropathy. Pl. Br. 7, Docket No. 14. Simply referencing a pre-existing medical condition or symptoms, however, has no bearing on the assessment of his functional limitations as of the ALJ's September 13, 2017 decision. *See Trenary v. Bowen,* 898 F.2d 1361, 1364 (8th Cir. 1990) (ALJ's proper focus is on the functional limitations caused by the claimant's impairment). This is especially true when, as here, the records reflect follow-up medical care for recovery from surgery and an infection that had seriously weakened him.[3]

### B.    January 2014 EMG

Craig M. alleges that a January 2014 EMG [R. 554-59] is "extremely material to the determinations regarding the nature and extent of [his] bilateral upper extremity symptoms, especially when considered with the construct of [his] medical providers'

---

[3] The same November 21, 2017 record claimant cites has progress notes by the nurse practitioner that reflect his ongoing recovery: "Since hospitalization he has made ongoing improvement in strength"; "minimal neck pain"; "Intermittent pain . . . that radiates through the arms"; "chronic numbness/tingling in the hands from diabetic peripheral neuropathy, this is unchanged"; "Incision is well healed and left upper extremity weakness has significantly improved. Continue to work on strengthening of the arm."; patient declines physical therapy "due to travel distance"; "Monitor symptoms of arm pain, if worsening or weakness worsens he will contact us."; "Inquired my opinion on long term disability. I did state the it is likely he would not return to his previous level of employment as a heavy equipment operator, however he would be able to perform different employment in the future."; "Slowly alleviate lifting restrictions by 5-10 lb weekly as tolerated." R. 31-32.

ongoing struggles to determine the true nature of [his] upper extremity problems." Pl. Br. 6, Docket No. 14. He states that the ALJ referred to the absence of the EMG in the treatment records she reviewed. *Id.* at 6-7; *see* R. 388, 394, 399. But the ALJ did not base her RFC determination on the absence of the EMG in the record; she based it on the multiple diagnoses, symptoms, and resulting functional limitations that were supported by the record. Moreover, the EMG itself does not set forth any functional limitations for any of his symptoms.

Craig M. acknowledges that particular symptoms are not necessarily attributable to a particular impairment or diagnosis. *See* Pl. Br. 10 ("An added complication is the confusion over whether Plaintiff's symptoms were from his diabetes, radicular symptoms from his neck, left shoulder impingement symptoms, and/or carpal tunnel/ulnar nerve symptomology."), 11 ("It is clear from the record that Plaintiff's providers were ruling out various conditions as they attempted to treat Plaintiff's multitude of symptoms."), 12 ("It is clear from the January 2014 EMG that there was a good deal of confusion over the etiology of Plaintiff's bilateral upper extremity symptoms."), Docket No. 14. The "missing" EMG might have made a difference if any provider had relied on it to support an opinion on Craig M.'s functional limitations and if the ALJ had then discounted the provider's opinion because no EMG was in the record. But that is not the circumstance here.

Craig M. does not explain how the January 2014 EMG is material to his functional work-related limitations as they existed at the time of the September 13, 2017 ALJ decision. He worked as a heavy equipment operator until October 15, 2015, twenty-one months after the EMG. Whatever the January 2014 EMG showed with respect to

his extremities, any symptoms did not prevent him from performing that job. By the time

of the ALJ's decision in September 2017 she found that he could not perform this past

work based on the evidence in the record.

She then determined he had the RFC to perform light work with the following

additional limitations:

> no climbing of ladders, ropes, or scaffolds; occasional climbing of ramps
> or stairs; occasional stooping, kneeling, or crouching; no crawling; no
> tasks that would specifically require the act of balancing, such as walking
> along a narrow plank; no work at unprotected heights; in essentially an
> indoor, temperature-controlled type environment, such that there would
> not be exposure to extreme heat, extreme cold, humidity, wetness, fumes,
> dust, odors, gases, poor ventilations, and those types of irritants; and
> allowing for the opportunity to sit or stand while remaining in the work
> space performing the task at hand.

R. 387, 390. For the reasons stated in the sections below, the Court finds that

substantial evidence in the record, including newly submitted medical records, supports

the ALJ's RFC determination.

### 1.    Carpal Tunnel Syndrome

Craig M. alleges that the "January 2014 EMG also included findings of carpal

tunnel." Pl. Br. 7, Docket No. 14. The EMG conclusions were not definitive, however,

noting "possible" carpal tunnel syndrome among several conclusions in the EMG report:

> 3.  Median sensory nerve responses are absent bilaterally. Median distal
> onset latencies are prolonged **suggesting possible superimposed
> carpal tunnel syndrome**. There is evidence of chronic but not acute
> denervation process in abductor pollicis brevis muscles bilaterally. Clinical
> correlation recommended.

R. 554 (emphasis added).

The ALJ assessed carpal tunnel as follows:

> **The record also refers to a diagnosis of carpal tunnel syndrome
> based on EMG findings in the past**. (Exhibit 9F/5) [R. 1048-70] The

record contains no actual EMG report, however, and related clinical findings on independent medical examinations in July 2016 and December 2016 were inconsistent. (Exhibits 9F/7; 15F/4) [R. 1048-70, 1168-77] Moreover, **the record documents no treatment for carpal tunnel syndrome during the relevant period**. Therefore, the undersigned finds no severe impairment related to carpal tunnel syndrome, and **will evaluate any possible related symptoms in terms of diabetic neuropathy**.

R. 388 (emphasis added).

The ALJ did not decline to consider any symptoms based on the absence of an EMG from January 2014. Rather, she found no records showing any treatment for carpal tunnel during the relevant period, considered clinical findings in two independent medical examinations in 2016, and evaluated "possible related symptoms" in terms of diabetic neuropathy. If the EMG had been in the record for the ALJ to review, the Court does not see how it would have materially altered her assessment of his *functional* limitations. The Court finds that the newly submitted evidence of the January 2014 EMG was not material to the ALJ's consideration of symptoms related to carpal tunnel and her RFC determination of work-related limitations.

### 2.   Diabetic Neuropathy

Craig M. alleges the ALJ "specifically cited the missing EMG as a basis on which to find [his] diabetic neuropathy symptoms not as limiting" and the ALJ's "findings of [his] residual functional capacity also failed to account for the symptoms and limitations from [his] peripheral neuropathy and/or related upper extremity limitations." Pl. Br. 6, 10, Docket No. 14. The Court disagrees.

The ALJ acknowledged Craig M.'s long history of diabetic neuropathy but found the records did not document a loss of motor function in his upper or lower extremities due to neuropathy:

In terms of the claimant's diabetes, the medical record documents a long history of poor control, with reference to poor compliance with diet and exercise recommendations. **The record also documents a long history of diabetic neuropathy** related to poor control. **A medical report from July 2015 makes reference to EMG evidence of polyneuropathy, but the record contains no actual EMG report, or any recommendation from a treating medical source regarding a repeat EMG** (Exhibit 1F/2-3, 5, 56, 60, 65, 74; 8F/9-10; 11F/4, 11) **Further, the record documents no evidence of loss of motor function in the upper or lower extremities due to neuropathy.** (Exhibits 1F/58; 9F/7; 14F/23; 15F/4) **Moreover, despite his uncontrolled diabetes and diabetic neuropathy, the claimant was able to work at the substantial gainful activity level for many years as a heavy equipment operator.** (Exhibit 6D) The claimant reported that this work involved handling big and small objects much of the workday, and the claimant **did not report being unable to perform job duties due to symptoms of neuropathy.** (Exhibit 4E/2) He testified that climbing the ladder to his front end loader was difficult due to shortness of breath, but **not due to neuropathy symptoms in his hands or feet**. Moreover, the claimant reported activities of **deer hunting, snow shoveling, splitting wood, mowing grass, and weed whipping, which do not support significant neuropathy symptoms.** (Exhibits 1F/15; 11F/7)

R. 394-95 (emphasis added).

It is true, as quoted above, that the ALJ noted the absence of an EMG in the record, and the newly submitted January 2014 EMG does say a repeat EMG might be considered "depending on evolution of symptoms."[4] R. 555. However, the ALJ did not say the absence of an EMG meant he had no limitations due to neuropathy. Rather, she concluded that the limitations she had already incorporated into the RFC fully accounted for his neuropathy symptoms, and the records did not support any additional limitations beyond those she had already found:

---

[4] The EMG's Conclusion #4 states: "Ulnar sensory nerve response are absent bilaterally. Right ulnar motor nerve response is essentially normal as noted above. Left ulnar motor nerve was not tested. There is evidence of mild chronic denervation process in 1st dorsal interossei muscles bilaterally. Flexor carpi ulnaris muscles are normal bilaterally. Overall, these findings are most consistent with peripheral polyneuropathy. However, possibility of superimposed ulnar neuropathy cannot be excluded. Consider repeat EMG study depending on evolution of symptoms."

>   Accordingly, the undersigned finds that **the claimant's diabetes and related neuropathy is fully addressed by the above light residual functional capacity assessment**, particularly in terms of balance and hazard limitations. The record documents no motor deficits related to the claimant's neuropathy to support additional limitations . . . .

R. 395 (emphasis added).

The ALJ properly focused on what the records documented in terms of functional limitations in his upper and lower extremities due to his neuropathy. Nothing in the January 2014 EMG addresses Craig M.'s functional limitations, and particularly not his limitations as they existed almost two years later when claimant ceased working, much less three and a half years later when the ALJ issued her decision.

Craig M. does not explain how the EMG would have materially changed the ALJ's assessment, given that he worked as a heavy equipment operator for 21 months after the EMG and that later records, during the relevant period, did not document loss of motor functions due to neuropathy. In his Work History Report dated February 16, 2016 he reported that his equipment operator job required him to "handle, grab or grasp big object" for 7.5 hours per day, "reach" for 8 hours per day, "write, type or handle small objects" for 5 hours per day, and "climb" for 0.25 hour per day. R. 778. There is nothing in the record indicating he was unable to perform any of these job activities either at the time of the January 2014 EMG or through his last day of work on October 15, 2015.

Later records from December 2015 and August and December 2016 state he was able to shovel snow, hunt deer, split wood, mow grass, and whip weeds. R. 855, 1083, 1160. An office visit for weight management in August 2016 states: "Activity/Exercise: Compliance has been very active. Split wood, mow grass, weed

whip. Willing to continue." R. 1083. An independent medical examination in July 2016, performed for workers' compensation purposes, found his "[m]otor strength was normal" in both his upper and lower extremities and his [g]rasp strength appeared to be strong and symmetrical in both hands." R. 1054. An independent neurologic examination in December 2016, also for workers' compensation purposes, found that his "[m]otor strength is 5/5 in both upper and lower extremities and symmetrical bilaterally, both proximally and distally," while noting some "mild to moderate" abnormal sensation in his fingers and toes "consistent with diabetic polyneuropathy." R. 1171.

Craig M. asserts the ALJ "did not allow for the progressive worsening of [his] diabetic neuropathy" and that the records "reflect a gradual worsening." Pl. Br. 10-11, Docket No. 14. However, he does not point to any record that undermines the ALJ's decision and shows his functional limitations from neuropathy were greater than found by the ALJ in September 2017. He cites a December 2014 record as "showing that [his] diabetic neuropathy was worsening." *Id.* at 11. However, the record he cites at R. 913 simply says he was there for "follow up evaluation of multiple medical conditions," he "reports neuropathy symptoms have been worse," and he requests a prescription refill for back pain. It says nothing about functional limitations resulting from his symptoms.

He next cites a July 2015 record in which he described neck and arm pain "aggravated by grueling workday[s]" as a heavy equipment operator and some "numbness in his hands" that "he attributes [] to neuropathy" but he "denies any weakness," has "[n]o history of dropping objects," and "[n]o recent slips, trips or falls." R. 896. Both of these medical visits took place while he was still working as a heavy

equipment operator, not during the relevant disability period of October 15, 2015 to September 13, 2017.

Finally, claimant asserts that in "late 2017" his "upper extremity neuropathies were tested and found significant." Pl. Br. 11, Docket No. 14. However, he does not identify any particular record but rather simply cites generally to the 522 pages of newly submitted medical records at R. 16-64, 66-381, 430-586.[5] *Id.* The Court reviewed the 157 pages of records at R. 430-586 that the Appeals Council reviewed (i.e., the records that relate to the period of alleged disability) and concluded did "not show a reasonable probability" of changing the outcome of the ALJ's decision. R. 2. The Court finds, after reviewing those same records, that most of them do not pertain to diabetic neuropathy at all, and those that do relate to diabetic neuropathy do not address any functional work-related limitations.[6]

The Court also reviewed the 365 pages of newly submitted records at R. 16-64 and 66-381 that the Appeals Council concluded were outside the period of disability. R. 2. As discussed above, the Court agrees that these records from October and November 2017 do not relate to the period at issue but rather document his hospitalization for neck surgery, abscess drainage, a serious infection, and post-surgery physical therapy and follow-up. The few references to claimant's neuropathy symptoms

---

[5] Craig M. cited the records at "16-64, 66-586" but pages 382 to 429 are not medical records.

[6] The Court notes a January 2016 record that refers to his "history of diabetic neuropathy" and says the provider "will continue to monitor for any worsening symptoms." R. 435.

have no bearing on the ALJ's RFC determination that was based on his functional limitations as of September 13, 2017. *See, e.g.,* R. 27, 31, 98.[7]

### C.    Diabetic Retinopathy

The ALJ considered Craig M.'s history of diabetic retinopathy but found it did not qualify as a "severe" impairment during the relevant period because the diagnosis of "active" retinopathy in his right eye was made just two months before her September 13, 2017 decision and the record did not establish that it was likely to last for 12 continuous months. R. 388. She stated, in relevant part:

> The record also indicates diagnoses of diabetic retinopathy . . . . (Exhibit 11F/4) . . . Further, **the record documents no findings related to active retinopathy until June 2017, and contains no evidence those findings are likely to persist for 12 continuous months**. (Exhibit 18F/6-7) Therefore the undersigned does not find diabetic retinopathy . . . to be [a] severe medically determinable impairment[] for the relevant period.

R. 388 (emphasis added).

In arguing that the ALJ erred, Craig M. cites to "multiple references to [his] diabetic retinopathy over the years" in the medical records, including a January 2015

---

[7] Other records during this time period that refer to upper extremity weakness do so in the context of claimant's post-surgical recovery, not as neuropathy symptoms. *See, e.g.,* R. 372 (pre-surgery examination noting "excellent grip bilaterally", "biceps, triceps, and deltoids are all normal bilaterally", "also has completely normal strength of the iliopsoas, quadriceps, tibialis anterior, and gastrocnemius"); R. 196 ("Left arm (shoulder and upper arm) weakness post op which is improving."); R. 306 ("He has weakness now of left arm and hand that is new to him."); R. 309 ("decreased sensation in both hands" and "both feet"); R. 176 ("[P]atient is . . . reportedly displaying weakness of upper left arm, but maintains good hand function. Since he had left hemilaminectomy at C4 and C5, this most likely represents nerve impingement at those levels."); R. 177 ("The patient has intact strength everywhere, except his left deltoid and biceps are definitely weak. It is unclear of the etiology for this. . . . It may be from positioning since he [is] a huge man and his shoulders needed to be taped for the surgery to keep them from falling forward . . . so he may have a minor upper plexus strain related to that. I would anticipate recovery if that is the case. He does have some numbness in the left hand to go along with that suspected diagnosis. He has excellent strength bilaterally of his lower extremities . . . .").

Diabetic Eye Exam in which he "reported problems with his left eye" and the provider noted "previous PRP laser treatment in both eyes." R. 908-11; Pl. Br. 8, Docket No.14. But the ALJ did not say his diabetic retinopathy had not continued for 12 or more months; to the contrary, she discussed his history of diabetic retinopathy over several years. Rather, she was specifically referring to a July 2017 diagnosis of active retinopathy in the right eye, as distinct from his previous history of inactive retinopathy in both eyes:

> The record contains a report of a visual examination from August 2016, which refers to treatment for diabetic retinopathy over five years previously. However, the claimant **reported his vision was stable in August 2016**, and indicated his blood sugar control was better on new insulin. (Exhibit 18F/1) He was noted to have cataracts in both eyes, which were asymptomatic and not at a surgical level, and **no active retinopathy**. Best corrected visual acuity was noted to be good. He was advised to follow-up in one year. (Exhibit 18F/1-2) The claimant returned for follow-up in May 2017, and reported a one-week history of floaters in both eyes, but greater on the right. The claimant was found to have a small area of clustered blot hemorrhages in the retinal vessels of the right eye, but **inactive retinopathy in both eyes**, and no current treatment was recommended. In terms of cataracts, the claimant reported only tolerable visual symptoms, and observation was recommended. He was advised to follow-up in one month. (Exhibit 18F/4-5) **When seen again in June 2017**, the claimant reported blurred vision on the right, and was **found to have active right retinopathy** in terms of mild vitreous hemorrhage. **He was referred to vitreoretinal surgery for further evaluation and management.** (Exhibit 18F/6-7) **As this diagnosis of active retinopathy is only recent, and there is no documentation it would be expected to last for 12 continuous months, the undersigned finds this impairment to be non-severe, as discussed previously.**

> * * *

> **[N]o limitations are supported by the claimant['s] very recent diagnosis of active right retinopathy.**

R. 395 (emphasis added).

Craig M. does not identify any record, either before or after the ALJ's decision, to support his argument that his active right retinopathy was likely to persist for 12 continuous months. *See* Pl. Br. 8, 10, Docket No. 14. His December 10, 2017 letter to the Appeals Council also did not mention diabetic retinopathy. R. 838-39. There is substantial evidence in the record to support the ALJ's conclusion that his active right retinopathy was not a "severe" impairment on or before September 13, 2017 and her RFC determination that did not include any functional limitations specific to that recent diagnosis.

### D.    Cervical Degenerative Disc Disease

Craig. M. alleges the ALJ's "finding that [his] cervical degenerative disc disease does not qualify as a severe medical impairment is not supported by the record." Pl. Br. 8, Docket No. 14. His brief points to several places in which the medical records document the diagnosis of cervical degenerative disc disease. *Id.* 8-10. But his assertion is incorrect, as the ALJ did in fact find it to be a severe impairment:

> 3. The claimant has **the following severe impairments**: coronary artery disease; chronic obstructive pulmonary disease; right diaphragm paralysis; asthma; diabetes with neuropathy; left shoulder rotator cuff impingement/tendinopathy; obesity; **degenerative disc disease of the cervical spine**; and obstructive sleep apnea (20 CFR 404.1520(c)).
>
> The above medically determinable impairments significantly limit the claimant's physical ability to do basic work activities, and are therefore **severe**.

R. 387 (emphasis added).

He also states that the ALJ "neglected to consider [his] . . . cervical degenerative disc disease in [his] residual functional capacity." Pl. Br. 10, Docket No. 14. This too is

incorrect, as the ALJ specifically evaluated degenerative disc disease records when she analyzed his functional limitations:

> **In terms of degenerative disc disease**, the record documents multilevel changes on an MRI scan of the cervical spine in June 2015. (Exhibit 1F/128-129) However, in September 2015, it was reported that a neurologist has reviewed the scan, and felt that the findings were "not all that bad." (Exhibit 1F/30) No related examination findings have been noted by any treating medical provider during the relevant period, and no specific treatment has been recommended. (Exhibit 1F/6, 8, 9) The record indicates the claimant was taking chronic opiate pain medication for some time prior to his alleged onset date of disability, for complaints of neck and back pain. However, the record suggests that refills of such medication were stopped in September 2015, when the claimant declined to be seen for refill purposes. (Exhibit 1F/3, 26-28) An independent medical examiner noted some reduced range of motion of the cervical and lumbar spine in July 2016, with increased tone and spasm in the cervical muscles, and some decreased reflexes in the left upper extremity. However, another independent medical examiner in December 2016 made no similar findings. Both examiners found normal upper and lower extremity strength and gait. (Exhibits 9F/6-8; 15F/4) Although the record refers to lumbar disc prolapse with radiculopathy in April 2009, the record contains no imaging studies of the lumbar spine to support any medically determinable lumbar impairment. (Exhibit 1F/3) While hospitalized for right diaphragm plication in September 2016, the claimant received some pain medication for complaints of back pain, but no specific back findings were documented. (Exhibit 12F/3) In November 2016, the claimant specifically reported to Dr. Montana that he was unable to work due to chronic low back and neck pain. However, he was noted to appear in no acute distress, and no back or neck findings were noted, and no back or neck impairment was diagnosed (Exhibit 14F/19).

R. 396 (emphasis added). The ALJ concluded that her review of the medical records regarding cervical degenerative disc disease "supports the above residual functional capacity assessment" of light work with additional limitations. R. 397. She clearly considered the treatment records regarding cervical degenerative disc disease when making her functional capacity determination. R. 396-97.

Accordingly, the Court finds no merit to the arguments regarding cervical degenerative disc disease, because the ALJ did in fact find it to be a "severe"

impairment at step two of the sequential evaluation process and did consider the medical records relating to cervical degenerative disc disease in making her RFC determination of light work with additional limitations at steps four and five of the process.

### E.     Opinion of Treating Primary Care Physician James Montana

In making a disability determination, an ALJ considers evidence that includes "medical opinion" evidence of the claimant's "impairment-related limitations or restrictions." 20 C.F.R. § 416.913(a)(2). Such limitations include the claimant's "ability to perform physical demands of work activities, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions" and "ability to perform mental demands of work activities, such as understanding; remembering; maintaining concentration, persistence, or pace; carrying out instructions; or responding appropriately to supervision, co-workers, or work pressures in a work setting." *Id.* § 416.913(a)(2)(i)(A) and (B).

A treating physician's opinion should be given controlling weight when it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record. 20 C.F.R. § 404.1527(c)(2); *Krogmeier v. Barnhart*, 294 F.3d 1019, 1023 (8th Cir. 2002). The record must be evaluated as a whole to determine whether the treating physician's opinion should control. *Tilley v. Astrue*, 580 F.3d 675, 679 (8th Cir. 2009). The ALJ must always give "good reasons" for the weight afforded to the treating source's opinion. *Id.* at 680; 20 C.F.R. § 404.1527(c)(2).

Craig M. contends that the ALJ "did not assign sufficient weight to the opinions of Dr. James Montana, [his] treating physician, in determining [his] residual functional capacity." Pl. Br. 11-12, Docket No. 14. He faults the ALJ for rejecting Dr. Montana's opinion on the basis that Dr. Montana did not support it with specific objective medical findings, and he points to various treatment records of Dr. Montana. *Id.* at 12-13. However, the ALJ also pointed to portions of the medical record that she found were inconsistent with Dr. Montana's opinion that Craig M. was unable to work (see below).

Moreover, the reason the ALJ did not give Dr. Montana's opinion "any significant weight" was not only because she concluded Dr. Montana did not support his opinion with specific objective medical findings but also because he did not support it with specific work-related limitations. R. 399. Dr. Montana did not opine on *any* functional capacity limitations for Craig M., as he made clear in his December 12, 2016 opinion letter:

> This letter is in regards to your request for a physical medicine source statement in regards to Craig M[]. Unfortunately, **I am not able to do what is essentially a functional capacity evaluation** in the office. If you think that is necessary, please recommend a physical therapist to perform the appropriate evaluation.
>
> **I am willing to review his medical history.** Craig has been a poorly controlled type I diabetic since age 17. As a result of his diabetes, he has diabetic neuropathy, retinopathy. In addition to those issues, he had surgery for a paralyzed right hemidiaphragm. Despite the surgery, he continues to have significant dyspnea with minimal exertion. He is still undergoing some further evaluation in regards to the etiology of his dyspnea. **In my opinion**, as a result of the patient's painful diabetic neuropathy and persistent functional dyspnea, **I do not feel the patient can work 8 hours a day routinely as a result of his neurologic diabetic complications and persistent functional dyspnea**, which is multifactorial in nature and is not likely to improve in the foreseeable future.
>
> I hope the above information is helpful.

R. 1128 (emphasis added).

The ALJ evaluated Dr. Montana's opinion as follows:

In December 2016, Dr. Montana submitted a statement in which he opined the claimant would be unable to work due to painful diabetic neuropathy and persistent functional dyspnea. (Exhibit 13F) However, **Dr. Montana did not support his opinion with specific objective medical findings, or with specific work-related limitations.** Further, Dr. Montana's treatments during the relevant period **document no complaint of disabling neuropathic pain, or any objective findings related to neuropathy. At most, the claimant reported neuropathy symptoms in his upper and lower extremities in June 2016, and Dr. Montana noted that an EMG in the last couple years showed findings of diabetic neuropathy.** There is no indication that Dr. Montana ever prescribed any neuropathic pain medication for the claimant, or recommended any other evaluation or treatment. (Exhibits 8F/9-10; 11F/4-5, 11-17; 12F/6-7; 14F/18-19) Moreover, **in terms of persistent functional dyspnea, the record documents improved breathing and activity tolerance with right hemidiaphragm plication and BiPAP therapy later in 2016, with evidence of only mild persistent asthma on a methacholine study**. (Exhibits 14F/16, 35) Therefore, the undersigned does not find Dr. Montana's opinion to be supported by substantial evidence, and has not given it any significant weight.

R. 399 (emphasis added).

The Court finds that the ALJ gave supported reasons for discounting Dr. Montana's opinion and that substantial evidence in the record as a whole supports her decision that Craig M. is not disabled because he can perform light work with additional specific limitations. *See Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010) (ALJ must evaluate the record as a whole to determine whether treating physician's opinion should control). Dr. Montana did not tie his opinion to any particular functional limitations and specifically declined to do a functional capacity evaluation of Craig M. *See* R. 1128. Rather, he stated in a conclusory manner that he "d[id] not feel the patient can work 8 hours a day routinely" due to his medical conditions. The bare statement that an

individual cannot work is an ultimate conclusion that is reserved to the SSA Commissioner. *See McDade*, 720 F.3d at 1000 (physician's "conclusory statement" that claimant "had become unable to work" on a particular date "is not entitled to deference because it is a judgment reserved for the Commissioner").

## RECOMMENDATION

Based on the foregoing and all the files, records and submissions, IT IS RECOMMENDED THAT:

1.    Craig M.'s Motion for Summary Judgment [Docket No. 13] be DENIED.

2.    The Commissioner's Motion for Summary Judgment [Docket No. 15] be GRANTED.

Dated: June 10, 2019

s/David T. Schultz
DAVID T. SCHULTZ
United States Magistrate Judge

## NOTICE

**Filing Objections:**  This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections.  LR 72.2(b)(2).  All objections and responses must comply with the word or line limits set for in LR 72.2(c).